IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS,
EASTERN DIVISION

| | | |
|---|---|---|
| CLARK CONSULTING, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 07 C 7231 |
| | ) | |
| v. | ) | Judge Shadur |
| | ) | |
| R. SCOTT RICHARDSON, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S RESPONSE BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR
EXPEDITED DISCOVERY AND MOTION FOR PRELIMINARY INJUNCTION**

If there ever was a textbook case of abuse of process, this is it. Plaintiff Clark Consulting ("Plaintiff") has sued Defendant Scott Richardson ("Richardson") for allegedly violating the terms of his restrictive covenant agreements, but it has no evidence that Richardson actually did so. Rather, Plaintiff has fabricated facts and has sued Richardson in an attempt to hassle him and his family. Indeed, one of Plaintiff's senior executives acknowledged to one of Richardson's former colleagues that Plaintiff's case against Richardson was not meritorious. Plaintiff has not only succeeded in hassling Richardson, but it has also succeeded in wasting the time and resources of this Court. Plaintiff's Motions for Expedited Discovery and for a Preliminary Injunction should be denied.

## I.     BACKGROUND

### A.     Plaintiff is Acquired and Reorganizes Its Sales Force

In its Complaint, Plaintiff conveniently omits the circumstances leading up to Richardson's termination.[1]  In March 2007, AEGON N.V., the large Netherlands-based life

---

[1]  Attached hereto as Exhibit A is the Affidavit of Scott Richardson. Richardson's Affidavit outlines the events leading up to his departure, and also addresses the frivolous allegations appearing in Plaintiff's Complaint.

insurance and pension company, completed its acquisition of Plaintiff, which had been announced in November 2006. Following the close of the acquisition, Mike Schaefer, Richardson's direct supervisor, informed Richardson that AEGON was in discussions to sell Richardson's unit to a competitor. Richardson was aware that the competitor used independent contractors as sales consultants, not employees. The sale of Richardson's unit never occurred.

In July 2007, after the sale of Richardson's unit apparently fell through, Plaintiff announced that effective December 31, 2007, it was reorganizing its work force and converting all of its Sales Consultants – including Richardson – from employees to independent contractors. (A copy of an excerpt from Plaintiff's presentation to its Sales Consultants relating to the reorganization is attached hereto as Exhibit B). Consequently, those Sales Consultants that were asked and wished to remain as independent contractors would lose all insurance coverage.

Richardson's Non-Disclosure and Non-Solicitation Agreement (attached to Plaintiff's Complaint as Exhibit A) expressly states that the non-solicitation provision does not apply in the event of an "involuntary termination through a reduction in workforce." (*See* Non-Disclosure and Non-Solicitation Agreement at ¶ 3). During several meetings and telephone calls that Richardson had with Schaefer relating to the possible sale of Richardson's unit and relating to the reorganization of the sales force, Schaefer repeatedly told Richardson that the reorganization constituted a "reduction in workforce" for purposes of the Non-Disclosure and Non-Solicitation Agreement and that the non-solicitation clause would not apply.

Losing insurance coverage was simply not an option for Richardson and his family because in May 2004, Richardson's wife, Jennifer, suffered a serious health incident, which was comparable to a stroke. Jennifer is disabled, and her prescriptions routinely cost over $1,000 per *month*. Schaefer and other of Plaintiff's executives were well aware of Jennifer's situation and

knew that insurance coverage was of paramount importance to Richardson. Upon learning that his unit may be sold (and knowing that the acquiring company uses independent contractors for sales consultants), Richardson began gathering information about the cost of obtaining alternative insurance coverage for his family. To Richardson's horror, he learned that Jennifer was generally *uninsurable* due to her pre-existing condition. Thus, securing some sort of insurance coverage was a major worry for Richardson and his family.

In early June 2007, Richardson met with representatives of Northwestern Mutual about becoming an authorized agent and seller of Northwestern Mutual's products. Once Northwestern Mutual approves someone as an authorized agent, that person and his family become eligible for insurance coverage under Northwestern Mutual's plans. This, of course, was very attractive to Richardson. Following Plaintiff's July 2007 announcement of the reorganization, Richardson began taking formal steps to secure an authorized agent's contract with Northwestern Mutual. Richardson intended to start his arrangement with Northwestern Mutual as of January 2, 2008, after his employment with Plaintiff was due to end.

In August 2007, Jim Effner, the managing partner of one of Northwestern Mutual's Chicago-area offices, informed Richardson that he had been approved to become an authorized agent of Northwestern Mutual and that he would send him a copy of Northwestern Mutual's standard agent contract for his consideration.

On or about August 22, 2007, Richardson had breakfast with Schaefer. Richardson told Schaefer that there was no way he could accept an independent contractor arrangement with Plaintiff because of the lack of insurance. Schaefer said he understood and stated that he would speak with Kurt Laning, Plaintiff's President, to determine if there was any scenario under which Richardson could maintain his insurance coverage with Plaintiff. Ultimately, no such

arrangement was possible, and Richardson's employment, like all other Sales Consultants, was due to end as of December 31, 2007.

### B.    Schaefer Takes Away the Bulk of Richardson's Responsibilities

In late August 2007, after Richardson told Schaefer that he could not accept an independent contractor arrangement with Plaintiff, Schaefer's treatment of Richardson abruptly changed.  Whereas prior to late August Schaefer appeared sensitive to Richardson's insurance issues, once Schaefer realized that Richardson would be leaving Plaintiff at year's end, he began taking responsibilities away from Richardson and curtailing communications with him.  For example, on or about August 27, 2007, Schaefer informed Richardson that he (Schaefer) would no longer pass any sales leads on to Richardson.  In early September, the Illinois League of Financial Institutions (ILFI) hosts its annual convention.  Because Richardson's sales territory included the Chicago region, he regularly attended the ILFI conference, as it was a good networking opportunity.  On or about August 29, 2007, Schaefer told Richardson that he did not want Richardson attending the ILFI conference.  In early September, Richardson learned that John Anderson, the Sales Consultant who oversaw the Madison, Wisconsin region, attended the ILFI conference in his place.  To Richardson's knowledge, Anderson had few responsibilities in Illinois.  Thus, the dye had been cast: Richardson was being shut out of his job.  By the end of August 2007, Richardson had little to do.  He had been constructively discharged.

### C.    Richardson's Departure

Meanwhile, in early September 2007, Richardson learned from Effner that Don Wilkinson, the person at Northwestern Mutual who had apparently approved Richardson's agent contract, was retiring in November 2007 and that several other Clark Sales Consultants were seeking Northwestern Mutual contracts.  Richardson became concerned that if he had to deal

- 4 -

with a Northwestern Mutual representative other than Wilkinson, there was always the possibility that the other representative would not approve Richardson as an authorized agent, particularly given that Richardson did not expect to start with Northwestern Mutual until January 2, 2008.  Because of the importance of insurance coverage, Richardson could not risk waiting until January 2008 to accept the agent contract with Northwestern Mutual.  Thus, on September 10, 2007, following several unsuccessful attempts to reach agreement with Schaefer on an earlier separation date, Richardson terminated his employment with Plaintiff and joined Executive Benefit Options (EBO) the next day.[2]  Richardson's resignation was hardly a surprise to anyone at Plaintiff, including Schaefer, especially considering that Richardson's exit was hastened when Schaefer took away most of Richardson's responsibilities.

## II.     ARGUMENT

### A.     Plaintiff Seeks Nothing More Than to Harass Richardson

If there was any question whether Plaintiff's motivation in suing Richardson is impure, Dave Hagen, Plaintiff's Vice President of Client Services, removed all doubt.  On December 11, 2007, Hagen had a conversation with Jeff Prescher, then Plaintiff's Manager of Design and Analysis, at Plaintiff's Bloomington, Minnesota offices, during which Hagen told Prescher that Plaintiff intended to sue Richardson.  Prescher expressed surprise to Hagen, commenting that he would be shocked if Richardson would violate the terms of his Non-Disclosure and Non-Solicitation Agreement, particularly given that Richardson is a lawyer.  Prescher stated to Hagen that it appeared that Plaintiff's case against Richardson was weak and that Plaintiff intended to sue Richardson merely to distract Richardson from focusing on his legitimate business venture and to harass him.  Hagen replied that he agreed with Prescher's assessment, and acknowledged

---

[2] EBO is little more than a marketing company that Richardson runs with his business partner, Paul McNellis.  Richardson entered into an agreement with Northwestern Mutual in his individual capacity

that Plaintiff had no evidence that Richardson had engaged in any wrongdoing.    Later on December 11, Prescher sent the following email to Richardson:

> . . . . Also, contractulations [sic] Scott on the lawsuit.  Per my sources Clark does not expect to win.  They simply want to hassle you.  Looks like they are succeeding. . . .

(A copy of Prescher's email is attached hereto as Exhibit C).  Prescher's "sources" were in fact a single source: Hagen.

The timing of Plaintiff's suit is also curious.  On December 21, 2007, Plaintiff's lawyers sent Richardson a letter under the auspices of Rule 4, informing Richardson that Plaintiff was filing suit against him on December 26, 2007.  (A copy of the December 21 letter is attached hereto as Exhibit D).  Plaintiff then filed suit on December 26, as it had promised.  It is no coincidence that Plaintiff waited until the Christmas season to sue Richardson.  Plaintiff wanted to do everything it could to ruin Richardson's Christmas.  Richardson resigned on September 10 – over 3½ months before Plaintiff sued.  In its Motion for Expedited Discovery, Plaintiff contends that "[t]his is a case in which time is of the essence."  (*See* ¶ 18).  As established by Hagen's conversation with Prescher and the suspicious timing of Plaintiff's lawsuit, this is simply not true.  If Richardson's departure truly threatened Plaintiff with irreparable harm, Plaintiff would have filed a Motion for Temporary Restraining Order immediately following Richardson's departure.  But it did not, and instead, it sat on its hand for 3½ months.  Plaintiff's request for expedited discovery is not only unnecessary, it is nothing more than a malicious attempt by Plaintiff to saddle Richardson with immense costs and to continue to harass him and his family.  Plaintiff's tactics are an utter waste of this Court's time and resources and must be stopped.

---

effective September 18, 2007.

**B.    Consistent with Its Intent to Harass Richardson, Plaintiff Has Fabricated Allegations Against Richardson**

Plaintiff alleges that Richardson has engaged in three primary acts of wrongdoing: (a) he allegedly solicited Forest Park National Bank & Trust on behalf of his new venture (Complaint at ¶ 39); (b) he allegedly misappropriated Plaintiff's confidential information (Complaint at ¶ 41); and (c) he allegedly sent "form letters" to Clark's clients (Complaint at ¶ 43). Plaintiff's claims are manufactured and find no basis in truth.

First, Plaintiff's allegations concerning Forest Park Bank are simply wrong. Specifically, Plaintiff alleges that Richardson has "worked a 1035 exchange [with Forest Park Bank] in violation of the Non-Disclosure/Non-Solicitation Agreement." (Complaint at ¶ 39).[3] But in his affidavit, Guy Giannini, Forest Park Bank's Chief Financial Officer, expressly states that no such "1035 exchange" has occurred. (A copy of Giannini's Affidavit is attached hereto as Exhibit E). Indeed, in mid-December 2007, Phil Hayes, Plaintiff's employee who assumed Richardson's responsibilities following Richardson's departure, paid Giannini an unannounced visit and specifically asked Giannini whether Richardson had completed a 1035 exchange for Forest Park Bank. (*see* Giannini Affidavit at ¶ 8). Giannini unequivocally told Hayes that Richardson had not. (*Id.*). Thus, Plaintiff knows – or would have known had it spoken to Hayes – that Richardson has not "worked a 1035 exchange" with Forest Park Bank. The only contact that Richardson has had with Forest Park Bank since his departure from Plaintiff relates to (a) answering questions from the bank's counsel about several supplemental executive retirement plan (SERP) documents that were in the works prior to Richardson's departure – and from which Plaintiff continues to receive commissions from the bank; and (b) estate planning matters for the

---

[3] A "1035 exchange" refers to a direct transfer of accumulated funds in a life insurance, endowment policy or annuity policy without creating a taxable event.

bank's two primary shareholders – work that Plaintiff does not and cannot perform.  (*See generally* Richardson and Giannini Affidavits).

Second, Plaintiff's allegations concerning Richardson's supposed misappropriation of Plaintiff's confidential information amount to nothing.  Plaintiff alleges that shortly before his resignation, "Richardson improperly *accessed* at least 22 electronic files."  (Complaint at ¶ 30 (emphasis added)).  Plaintiff fails to allege why Richardson's access of these files – which were primarily non-qualified benefit plan templates that were necessary for Richardson to perform his job – was improper, and more importantly, Plaintiff does *not* allege with any specificity that Richardson actually misappropriated these documents.  Plaintiff merely alleges that "upon information and belief," Richardson misappropriated the documents.  (Complaint at ¶ 41).  With present-day technology, it is quite easy for a company to determine whether files have been downloaded or taken from the company's computer system.  Plaintiff does not – and cannot – allege that Richardson actually took the documents because Plaintiff has no evidence that he did so.  In his Affidavit, Richardson states – under the penalties of perjury – that while it is likely that he accessed the files prior to his departure (because he used the files in performing his responsibilities), he did *not* take the documents.  (*See* Richardson Affidavit at ¶ 15).  It is clear that Plaintiff's use of the phrase "upon information and belief" in Paragraph 41 is merely code for: "We know that Mr. Richardson didn't take anything."

Plaintiff's final allegation – that Richardson, in a "sinister" fashion, has sent targeted form announcement letters to Plaintiff's clients (Complaint at ¶ 43) – is similarly baseless.  Not surprisingly, Plaintiff has not alleged that Richardson sent the announcement letters to any of the clients "with whom Employee . . . had communications on behalf of the Company within the twelve (12) months immediately preceding the termination of the Employee's employment with

the Company," as prohibited by paragraph 3 of Richardson's Non-Disclosure and Non-Solicitation Agreement, because Plaintiff has no evidence that he did so.[4]  Richardson sent the letters to companies appearing on a mailing list he received from the Illinois Bankers Association, and he was careful to not send a mailing to any "Client" or "Prospective Client" (as those terms are defined in the Non-Disclosure and Non-Solicitation Agreement) that appeared on the list. (*See* Richardson Affidavit at ¶ 16).

### C.    Notwithstanding, Plaintiff has Conceded that There is No Threat of Irreparable Harm

Even setting aside Plaintiff's blatant factual misrepresentations, Plaintiff's Motions are legally deficient.  Plaintiff completely ignores that included in Richardson's Non-Disclosure and Non-Solicitation Agreement is a clause that calculates damages in the event of Richardson's improper solicitation of Plaintiff's clients. (*See* Non-Disclosure and Non-Solicitation Agreement at ¶¶ 6(a) and (b)).  Following Richardson's resignation, Susan Linder, Plaintiff's General Counsel, confirmed in writing that Plaintiff's relief in the event of breach of the non-solicitation provision was legal in nature, not equitable:

> As you know, when Clark rolled out the template Non-Disclosure and Non-Solicitation from which your Agreement was created, *the approach taken by Clark was intended to avoid the legal entanglements associated with seeking injunctive relief* against former consultants who violated their non-competition or non-disclosure duties.  Rather, the provisions of the template (and your Agreement) offered peace of mind to Clark in circumstances where Clark has facilitated (e.g., through research, meetings, expenses, payroll, goodwill, etc.) the Client or Prospective Client interaction *by providing a revenue split in cases where a consultant terminates and later sells a product on behalf of a competitor.*

---

[4] Richardson does not concede that the non-solicitation provisions of the Non-Disclosure and Non-Solicitation Agreement (specifically, paragraph 3) apply to him.  In fact, Richardson contends that as of late August 2007, he was constructively discharged "through a reduction in workforce" and that the provisions of paragraph 3 of the Non-Disclosure and Non-Solicitation Agreement do not apply. Richardson reserves all arguments to this effect.

(emphasis added) (A copy of Linder's September 12, 2007 letter is attached to Plaintiff's Complaint as Exhibit C).    Accordingly, Plaintiff's contention in its Motion for Preliminary Injunction that it "has suffered and continues to suffer irreparable harm as a result of Richardson's" alleged misconduct (*see, e.g.,* ¶¶ 4(i) and 12) belies the words of its own General Counsel.  Plaintiff's relief, if any, is legal, not equitable.

## III.    **CONCLUSION**

Plaintiff's Complaint and its corresponding Motions for Expedited Discovery and Preliminary Injunction are nonsense.   As is evident from Dave Hagen's comments to Jeff Prescher, Plaintiff's sole motivation in suing Richardson is to hassle him.  And in an attempt to conceal its disturbing conduct, it has manufactured allegations against Richardson.  Plaintiff's conduct is reprehensible, and indeed, sanctionable. Richardson respectfully requests that this Court deny Plaintiff's Motions for Expedited Discovery and Preliminary Injunction and award Richardson his attorneys' fees and costs in having to respond to Plaintiff's frivolous pleadings.

Dated: January 2, 2008                              Respectfully submitted,

                                                                   **SCOTT RICHARDSON**,


                                                                   By:  /s/ Chad W. Moeller____
                                                                           One of His Attorneys


Chad W. Moeller
Michael F. Hughes
NEAL GERBER & EISENBERG LLP
2 N. LaSalle St., Suite 2200
Chicago, Illinois 60602
(312) 269-8000

# Exhibit A

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS,
EASTERN DIVISION**

| | | |
|---|---|---|
| **CLARK CONSULTING, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 07 C 7231** |
| | ) | |
| **v.** | ) | **Judge Shadur** |
| | ) | |
| **R. SCOTT RICHARDSON,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>AFFIDAVIT OF SCOTT RICHARDSON</u>

I, Scott Richardson, being of sound mind and in excess of the age of eighteen, state as follows under the penalties of perjury:

1.       I began my employment with Clark Consulting ("Clark") on February 5, 2001.  I began my employment with Clark as Director of the Professional Resource Group – Legal Services department, which supported the design, implementation and service of nonqualified benefit plans and related bank-owned life insurance (BOLI) programs for banks.  In 2003, Legal Services was established as a separate department, and I was promoted to Vice President of the department.

2.       In March 2005, I was offered and accepted the position of Senior Consultant with Clark in Chicago.  I commuted between Clark's offices in Bloomington, Minnesota and Chicago from March – December 2005.  I relocated to the Chicago area in January 2006.  In my role as Senior Consultant, I was responsible for calling on and servicing community banks (*i.e.,* banks with less than $1 billion in assets) in the Chicago area for purposes of designing and implementing nonqualified benefits plans and BOLI programs.

3.    In March 2007, AEGON N.V., a Netherlands-based life insurance and pension company with over $300 billion in assets, completed its acquisition of Clark, which had been announced in November 2006. Following the close of the acquisition, Mike Schaefer, my direct supervisor, told me that AEGON was in discussions with a competitor to sell my unit. I was aware that the competitor used independent contractors as sales consultants, not employees. The sale of my unit never occurred.

4.    In July 2007, after the sale of my unit apparently fell through, Clark announced that effective December 31, 2007, it was reorganizing its work force and converting all of its Sales Consultants – including me – from employees to independent contractors. Consequently, those Sales Consultants that were asked and wished to remain as independent contractors would lose all insurance coverage.

5.    Paragraph 3 of my Non-Disclosure and Non-Solicitation Agreement states that the non-solicitation provision does not apply in the event of an "involuntary termination through a reduction in workforce." In meetings and telephone calls I had with Mr. Schaefer relating to the possible sale of my unit, and relating to the subsequent reorganization of Clark's sales force, Mr. Schaefer repeatedly stated that the reorganization constituted a "reduction in workforce" and that the non-solicitation clause would not apply.

6.    Losing insurance coverage was not an option for me and my family because in May 2004, my wife, Jennifer, suffered a serious health condition that was comparable to a stroke. Jennifer is disabled, and her prescriptions routinely cost in excess of $1,000 each month. Mr. Schaefer and other Clark executives were well aware of Jennifer's situation and knew that insurance coverage was of paramount importance to me.

7.　　Upon learning that my unit may be sold (and that the acquiring company used independent contractors for sales consultants), I began gathering information about the cost of obtaining alternative insurance coverage for my family.　To my horror, I learned that Jennifer was generally uninsurable due to her pre-existing condition.　Securing some sort of insurance coverage was a major worry for my family and me.

8.　　In early June 2007, I met with representatives of Northwestern Mutual in Milwaukee about becoming an authorized agent and seller of Northwestern Mutual's products. Once Northwestern Mutual approves someone as an authorized agent, that person and his family become eligible for insurance coverage under Northwestern Mutual's plans.　This, of course, was very attractive to me.　Following Clark's July 2007 announcement of the reorganization, I began taking formal steps to secure an authorized agent's contract with Northwestern Mutual.　I intended to start my arrangement with Northwestern Mutual as of January 2, 2008, after my employment with Clark was due to end.

9.　　In August 2007, Jim Effner, the managing partner of one of Northwestern Mutual's Chicago-area offices, informed me that I had been approved to become an authorized agent of Northwestern Mutual and that he would send me a copy of Northwestern Mutual's standard agent contract for my consideration.

10.　　On or about August 22, 2007, I had breakfast with Mr. Schaefer.　I told Mr. Schaefer that there was no way I could accept an independent contractor arrangement with Clark because of the lack of insurance.　Mr. Schaefer said he understood and stated that he would speak with Kurt Laning, Clark's President, to determine if there was any scenario under which I could maintain my insurance coverage with Clark.　We ultimately were unable to reach such an arrangement.　Thus, as of December 31, 2007, I was facing the possibility of not being insured.

11.    In late August 2007, after I told Mr. Schaefer that I could not accept an independent contractor arrangement with Clark, Mr. Schaefer's treatment of me abruptly changed. Whereas prior to late August Mr. Schaefer appeared sensitive to my insurance issues, once Mr. Schaefer realized that I would be leaving, he began taking responsibilities away from me and curtailing communications with me. For example, on or about August 27, 2007, Mr. Schaefer informed me that he would no longer pass any sales leads on to me. In early September, the Illinois League of Financial Institutions (ILFI) hosts its annual convention. Because my sales territory included the Chicago region, I regularly attended the ILFI conference, as it was a good networking opportunity. On or about August 29, 2007, Mr. Schaefer told me that he did not want me to attend the ILFI conference. On or about September 8, 2007, I learned that John Anderson, the Sales Consultant who oversaw the Madison, Wisconsin region, attended the ILFI conference in my place. To my knowledge, Mr. Anderson had few responsibilities in Illinois. Thus, by the end of August 2007, I had little to do.

12.    Meanwhile, in early September 2007, I learned from Mr. Effner that Don Wilkinson, the person at Northwestern Mutual who had apparently approved my contract, was retiring in November 2007 and that there were several other Clark Sales Consultants who were seeking Northwestern Mutual contracts. I became concerned that if I had to deal with a Northwestern Mutual representative other than Mr. Wilkinson, there was always the possibility that the other representative would not approve me as an authorized agent, particularly given that I was not expected to start until January 2, 2008.

13.    Because it was imperative that I obtain insurance coverage, I could not risk waiting until January 2008 to accept the agent contract with Northwestern Mutual. Thus, following unsuccessful attempts to reach agreement with Mr. Schaefer on an earlier separation

date, on September 10, 2007, I resigned my employment with Clark and joined Executive Benefit Options (EBO) the next day. EBO is little more than a marketing company that I run with my business partner, Paul McNellis. I entered into a agreement with Northwestern Mutual in my personal capacity effective September 18, 2007.

14.    Clark alleges that since my departure, I have solicited Forest Park National Bank & Trust. Specifically, Clark alleges that I have "worked a 1035 exchange [for Forest Park Bank] in violation of [my] Non-Disclosure/Non-Solicitation Agreement." (Complaint at par. 39). This is nonsense. My only contacts with Forest Park Bank since my departure from Clark have been related to (a) answering questions from the bank's counsel about the implementation of supplemental executive retirement plan (SERP) documents for several executives of the bank, which had been in the works prior to my departure, so that Clark could begin servicing the SERPs; and (b) the provision of personal estate planning services to Forest Park Bank's two primary shareholders. I have not solicited or otherwise conducted business with Forest Park Bank in any capacity since my departure from Clark. I have not "worked a 1035 exchange" with Forest Park Bank.

15.    Clark also alleges that I have misappropriated its confidential information. Clark alleges that shortly prior to my departure, I accessed "at least 22 electronic files." (Complaint at par. 30). It is entirely possible, and indeed likely, that I accessed these files, as many of the documents were non-qualified benefit plan templates that I used in the performance of my job. I did not, however, take these documents either shortly prior to, or after, my departure from Clark.

16.    Clark further claims that I sent targeted announcement letters to Clark's clients. (Complaint at par. 43). This is not true. I obtained a mailing list from the Illinois Bankers Association as a benefit of my associate membership in the organization. I was very careful not

to send a mailing to any person or entity appearing on the list who was a client of Clark and with whom I had communications while I was employed by Clark.

17.     Clark also accuses me of "remov[ing] several phrases of the Non-Disclosure/Non-Solicitation Agreement" before I signed the Agreement. (Complaint at par. 27). Clark's allegations are absurd. I signed the version of the Agreement that was presented to me by Julie McCauley, Clark's Vice President of Sales Operations. I did not remove any provision from the Agreement, and indeed, I know that other Sales Consultants signed the identical version. For example, attached hereto as Exhibit 1 is the Non-Disclosure and Non-Solicitation Agreement of Ben Wickum, which is substantively identical to my Agreement.


FURTHER AFFIANT SAYETH NOT.


_____
                                                  Scott Richardson


Sworn to before me this
2nd day of January, 2008

_____
         Notary Public


OFFICIAL SEAL
TERESA D KIRBY
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:12/26/10

# Exhibit 1

## CLARK CONSULTING – BANKING PRACTICE
## NON-DISCLOSURE AND NON-SOLICITATION AGREEMENT

THIS NON-SOLICITATION AGREEMENT (the "Agreement") is made this _November 23_, 200_5_, by and between Clark Consulting, Inc., through its Banking Practice with principal offices in Bloomington, Minnesota (for itself, its predecessors, successors, subsidiary and affiliated entities, shareholders, officers, directors, executors, administrators, agents, fiduciaries, legal representatives, insurers, employee benefit plans, employee benefit plan fiduciaries, Employees, former Employees, and owners, all individually and in their official capacities), (all together referred to as the "the Company"), and ___Ben Wickum___, a resident of the state of ___Minnesota___ (the "Employee").

The Employee's position and responsibilities require access to confidential information and trade secrets developed by or owned by the Company. The Company desires to protect such confidential information and trade secrets, and the Company's client and prospect base, staff and the proprietary and confidential nature of its systems, ideas, and work products. Therefore, the Company and Employee hereby mutually agree as follows:

1.  **Access to Confidential Information.** Upon execution of this Agreement, and in consideration for his/her promises herein, the Company shall provide to Employee, and Employee shall receive access to the confidential and trade secret information of the Company.

2.  **Nondisclosure.** Employee acknowledges that he/she shall not disclose any Proprietary, Confidential or Trade Secret Information of the Company (as those terms are defined in the Company's Intellectual Property and Confidentiality Agreement) except at the request of, and for the purposes defined by, the Company. Proprietary, Confidential or Trade Secret Information of the Company shall include, but shall not be limited to, material marked as such by the Company.

3.  **Non-solicitation Covenants.** In order to protect the Company's significant investment in its Proprietary, Confidential and Trade Secret Information, Employee agrees the he/she will not, during his/her employment and for twelve (12) months following termination of employment for any reason other than involuntarily termination through a reduction in workforce:

    a.  Directly or indirectly, solicit away, or facilitate the solicitation away, from the Company of any Prospective Client of the Company;

    b.  Directly or indirectly, solicit away, or facilitate the solicitation away, from the Company of any Client of the Company or induce same to limit, alter or reduce its relationship with the Company;

    c.  Directly or indirectly, induce away, or facilitate the inducement away, from the Company of any personnel of the Company or interfere with the faithful discharge by such

personnel of their contractual and fiduciary obligations to the Company and its Clients; and

d.    Directly or indirectly, induce or attempt to induce or facilitate the inducement of (i) any insurance company to terminate or alter its relationship with the Company or (ii) any banking association or other trade organization to terminate or alter its relationship with the Company.

"Client" shall mean any person or entity for whom the Company performed services or provided products and with whom Employee, or the employees under his/her supervision or direction, had communications on behalf of the Company within the twelve (12) months immediately preceding the termination of the Employee's employment with the Company.

"Prospective Client" shall mean any person or entity to whom the Employee, or the employees under his/her supervision, submitted, prepared or presented, or assisted in the submission, preparation, or presentation of, a proposal, during the eighteen (18) month period preceding his/her or her termination.

4.    <u>List of Prospects</u>.  The Employee shall be responsible for keeping all client and prospective client lists up-to-date using PCMS or such other tools and procedures as the Company, in its sole discretion, may require.

5.    <u>Property of the Company</u>. The Employee acknowledges that he/she shall have the opportunity to inspect and use property of the Company in the scope of his/her employment. The Employee hereby agrees that such property shall remain the exclusive property of the Company, and the Employee shall have no right or proprietary interest in such property, including, without limitation, the Employee's or the Company's customer and supplier lists, contract forms, books of account, computer programs and similar property.

6.    <u>Breach of Agreement: Calculation of Damages</u>.  In the event of the Employee's breach of this Agreement, in addition to any other remedies to which the Company shall be entitled, the Employee agrees to pay damages to the Company according to the following schedule:

a.    For any sale, within twelve (12) months following the Employee's termination, to a Client or Prospective Client of any product or service offered by the Company's Banking Practice, where the Employee receives any benefit, directly or indirectly, the Company shall be entitled to a percentage of the gross fees and commissions (first-year and renewal) from such sale, as follows:

    i.    Up to six (6) months following termination, sixty percent (60%); and
    ii.    From six (6) months through twelve (12) months following termination, forty percent (40%).

The Company shall have no continuing post-sale service responsibilities or obligations for such sale.  For purposes of this Agreement, a "sale" shall be deemed to occur upon the earlier of (i) approval by a Client's or Prospective Client's board of directors of the purchase of the product, or (ii) the wiring of premium to an insurance carrier by the Client or Prospective Client.

b.    For a period of three (3) years following the Employee's termination, for any internal or external IRC §1035 exchange or upgrade of any product sold by the Company that (i) results in the loss of actual or expected renewal commissions by the Company and (ii) benefits the Employee in any way, directly or indirectly, the Company shall be entitled to sixty percent (60%) of the gross fees and commission (first-year and renewal) from such exchange. The Company shall have no continuing post-sale service responsibilities or obligations for such exchange.

7.    Subsequent Employment.    Employee acknowledges that he/she is obligated to notify any subsequent employer, or other entity with whom the Employee associates, of Employee's obligations under this Agreement following the termination of Employee's employment with the Company. Additionally, Employee specifically authorizes the Company to notify any such subsequent employer or entity regarding Employee's obligations under this Agreement following the termination of Employee's employment with the Company.

8.    Not an Employment Agreement. This Agreement is not a contract of employment for a definite term. Nothing in this Agreement modifies or is intended to modify the at-will status of the employment relationship between the Company and the Employee.

9.    Severability. If any portion of this Agreement is determined by a court to be unenforceable, the parties hereto expressly agree and request that the court modify such portion to allow it to be enforceable. All other provisions shall remain in effect.

10.    Controlling Law. This Agreement shall be construed under the laws of the state of Illinois.

11.    Successors and Assigns. The Company may assign its rights under this Agreement to any successor to its business (by merger, acquisition of substantially all of the Company's assets or otherwise), but Employee may not assign his/her rights or delegate his/her duties under this Agreement without the prior written consent of the Company. Employee understands and agrees that this Agreement shall be binding upon and inure to the benefit of the Company and its legal representatives, successors and assigns. Employee also understands and agrees that this Agreement shall be binding upon and inure to the benefit of Employee's heirs and executors or administrators.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized officers on the day and year first written above.

EMPLOYEE:                          COMPANY:
                                   Clark Consulting, Inc. – Banking Practice

_____          By: _____
Employee's Signature

                                   Title: Human Resources Representative

# Exhibit B



WWW.CLARKCONSULTING.COM

# Independent Contractor
# Sales Strategy

August 2007

---

Clark Consulting...

WWW.CLARKCONSULTING.COM

*We help clients
achieve __key financial goals__
by delivering
market - leading
knowledge
and
products*

This presentation is neither a contract nor
offer of employment

2

**Sales Strategy**

WWW.CLARKCONSULTING.COM

**High-Level Overview of New Independent Consultant Comp. Structure**

(actual terms/conditions will be reflected in the term sheet and agreement)

- 60% Aggregate Payout for Net First Year and Net Renewal Commissions for sales of new financial products
  - Both BOLI and COLI markets
- Reduced B/D Fee
  - 6.25% with Annual Excess Refund Feature
- Producer Responsible for Expenses

This presentation is neither a contract nor offer of employment

5

**Transitional Incentive**

WWW.CLARKCONSULTING.COM



- » **Consultants Will Continue as Employees under Current Contracts through 12/31/07**
  - Retroactive Bonus to 8/1/07 pays new comp on New Financial Product Sales
    - Paid under new contract if offered to consultant& signed by 11/01/07
- » **Three year supplemental payments on existing renewals (Pre-8/1/07) provided under the new independent contract:**
  - 7.50% added to applicable renewal percentage - 2008
  - 3.75% added to applicable renewal percentage - 2009
  - 1.25% added to applicable renewal percentage - 2010
  - New Contract must be in-force
  - Financial Products personally sold by consultant
- » **Previously Announced 2007 Sales Bonus Plan**
  - Must be an employee or an independent contractor with Clark at time of Payment
  - See Prior Emails

This presentation is neither a contract nor offer of employment

6

# Exhibit C

**From:** Jeff Prescher [mailto:jrprescher@yahoo.com]
**Sent:** Tue 12/11/2007 9:22 AM
**To:** Paul McNellis; Scott Richardson
**Subject:** Meeting Postponed

FYI--My flight was cancelled. After conferring with Sue Wonka and Meridee Maynard, we have decided to postpone our meeting until the next convenient opportunity (later this week, next week?).

After going to the airport this morning, I should have returned home and stayed there. Unfortunately, I decided to save my "paid time off" and went into the office. Knowing that my flight was cancelled due to weather in another city, the upper ups correctly identified who I was meeting with. This should make my remaining two weeks a little more interesting (or, perhaps, isolated). Also, contractulations Scott on the lawsuit. Per my sources Clark does not expect to win. They simply want to hassle you. Looks like they are succeeding. (All the more reason to open an office here and dig a hole in Clark a little deeper. I could have                         , and perhaps even            Taking any three of these might critically wound the Bloomington office. If sales support defaults to Dallas, its only a matter of time before Clark folds in the banking market. Do you think         would be interested in that?)

I'll keep you updated.

Jeff Prescher
Home:
Work:
Cell:


Be a better friend, newshound, and know-it-all with Yahoo! Mobile. Try it now.

# Exhibit D

*ER* **MUCHIN**

**Lauer Muchin Dombrow Becker Levin and Tominberg, Ltd.**

December 21, 2007

*Writer's Direct Dial: (312) 494-5348*

**VIA E-MAIL (SCOTT.RICHARDSON@EBOPTIONS.NET)**

Mr. R. Scott Richardson
3023 Long Common Parkway
Elgin, Illinois 60123

     Re:   *Clark Consulting, Inc., Plaintiff v. R. Scott Richardson, Defendant*

Dear Mr. Richardson:

     Please be advised that Hunton & Williams LLP and this Firm have been retained to represent the interests of Clark Consulting, Inc. regarding the following claims.

     On Wednesday, December 26, 2007, we will file a Complaint against you seeking injunctive relief and damages based upon your: (1) breach of the Illinois Trade Secret Act; (2) breach of fiduciary duty and the duty of loyalty; (3) equitable estoppel; (4) breach of contract (your employee confidentiality agreement); and (5) breach of contract (based upon your violation of your non-disclosure and non-solicitation agreement with Clark Consulting). The Complaint will be filed in the United States District Court for the Northern District of Illinois, Eastern Division. Together with the Complaint, we will file a Motion for Preliminary Injunction and a Motion for Expedited Discovery.

     Rule 4 of the Federal Rules of Civil Procedure requires parties to cooperate in saving unnecessary costs of service of a Summons and Complaint. By waiving service, a defendant is allowed more time to answer a complaint than if the summons had been actually served when the Request for Waiver of Service was received.

     I write to ask that you advise me, via return e-mail, whether you will be willing to accept service of Summons and Complaint on Wednesday, December 26, 2007. If I have not heard from you by the close of business on Monday, December 24, you may anticipate being served on Wednesday by a special process server. Any attempt to evade service by our special process server will be brought to the attention of the Court promptly. Also, I remind you that it is your duty to preserve <u>all</u> evidence, electronic or otherwise, from destruction or loss. I will look forward to hearing from you.

*LANER    MUCHIN*
Laner Muchin Dombrow Becker Levin and Tominberg, Ltd.

Mr. R. Scott Richardson
December 21, 2007
Page 2

Very truly yours,

Gregory R. James, Jr.
One of the Attorneys for Clark Consulting, Inc.

GRJ:ph
cc:    Alan Marcuis, Esq.
       Joseph M. Gagliardo, Esq.
       Thomas S. Bradley, Esq.

# Exhibit E

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS,
EASTERN DIVISION

CLARK CONSULTING, INC.,           )
                                  )
            Plaintiff,            )        Case No. 07 C 7231
                                  )
    v.                            )        Judge Shadur
                                  )
R. SCOTT RICHARDSON,              )
                                  )
            Defendant.            )

## AFFIDAVIT OF GUY GIANNINI

I, Guy Giannini, being of sound mind and in excess of the age of eighteen, state as

follows under the penalties of perjury:

1.      I am the Chief Financial Officer (CFO) of Forest Park National Bank & Trust (the

"Bank"). I have been employed by the Bank for 22 years. I was hired as the Bank's Controller,

and approximately seven years ago, my title changed to CFO.

2.      I have firsthand knowledge of the Bank's relationship with Clark Consulting. I

am the Bank's primary contact with Clark Consulting.

3.      Several years ago, the Bank and its holding company purchased bank-owned life

insurance (BOLI) policies for the Bank's two primary shareholders. The Bank purchased the

BOLI policies through Clark Consulting. The BOLI policies were what are known as split dollar

policies, whereby the Bank paid the policies' premiums, the Bank maintained an interest in the

policies' cash surrender values, and the net death benefits (*i.e.*, the difference between the death

benefits and cash surrender values) would be paid to the shareholders' designees. Ultimately, the

BOLI policies proved to be poor investments for the Bank because the cash surrender values did

not appreciate as expected.

4.      In approximately 2006, I expressed to Scott Richardson, my contact at Clark Consulting, that the Bank was not satisfied with its return on the BOLI policies, and that the Bank was meeting with competitors to consider other options. In fact, one of the Bank's shareholders had completed the underwriting process with a competitor, and we were prepared to leave Clark Consulting in early 2007. After some subsequent discussions with Mr. Richardson in early 2007, during which he raised estate planning issues for the Bank's two shareholders, I concluded that the shareholders were in need of greater individual insurance coverage. I now viewed this as more of an estate planning matter for the two primary shareholders individually than as a BOLI-related matter for the Bank.

5.      It is my understanding that Clark Consulting did not have internal capabilities to handle estate planning matters. In Spring 2007, Mr. Richardson introduced me to an outside insurance broker with significant estate planning expertise, which would allow the shareholders to obtain individual insurance coverage and address other estate planning issues. This introduction occurred while Mr. Richardson was still employed by Clark Consulting.

6.      Meanwhile, throughout Spring and Summer 2007, while Mr. Richardson was still employed by Clark Consulting, Mr. Richardson, on behalf of Clark Consulting, assisted in the preparation and implementation of supplemental executive retirement plans (SERPs) and related BOLI policies for six executives of the Bank. To date, the Bank's relationship with Clark Consulting continues with respect to the executives' SERPs and the BOLI policies. Following Mr. Richardson's departure from Clark Consulting, Mr. Richardson continued to cooperate with the Bank's counsel – with no compensation – to answer any questions that counsel had about the SERP documents and to help transition the work to Phil Hayes, our new contact at Clark

Consulting Consulting. I appreciated Mr. Richardson's cooperation and recognize that it is something he did not have to do.

7.    Because of the poor return on its investment, the Bank's holding company has terminated the BOLI policy of one of the Bank's shareholders. The Bank's holding company took this action without any influence by Mr. Richardson. The Bank will most likely attempt to sell the other BOLI policy on the secondary market within the next month or two. It is my understanding that if the other BOLI policy is sold on the secondary market, it will remain in force and Clark Consulting will retain a financial interest in the policy.

8.    I understand that Clark Consulting has alleged that Mr. Richardson has "worked a 1035 exchange" for the Bank since his departure from Clark Consulting. This is simply not true. The only contact that Mr. Richardson has had with the Bank since his departure from Clark Consulting has been related to estate planning matters for the Bank's two primary shareholders – work that Clark Consulting could not service. This work has not involved 1035 exchanges. In fact, in mid-December 2007, Mr. Hayes (my new contact at Clark Consulting) dropped by my office unannounced and specifically asked me whether the Bank was "1035ing" the shareholder's remaining BOLI policy. I told Mr. Hayes that the Bank was not engaging in any such exchange.

FURTHER AFFIANT SAYETH NOT.

_____
Guy Giannini

Sworn to before me this
_2_ day of January, 2008

_____
Notary Public

Official Seal
Victoria S Diana
Notary Public State of Illinois
My Commission Expires 12/26/2010

- 3 -

## CERTIFICATE OF SERVICE

I, Chad W. Moeller, an attorney, state that the foregoing Defendant's Response Brief in Opposition to Plaintiff's Motion for Expedited Discovery and Motion for Preliminary Injunction was served upon:

Thomas S. Bradley                          David C. Lonergan
Gregory R. James, Jr.                      Alan J. Marcuis
Laner, Muchin, Dombrow,                    Sarah E. Wallner
  Becker, Levin and Tominberg, Ltd.       Hunton & Williams LLP
515 N. State Street, Suite 2800            1445 Ross Avenue, Suite 3700
Chicago, Illinois 60610                    Dallas, Texas 75202-2799
(via electronic filing system)            (via Federal Express)


on this 2nd day of January, 2008.

                                   /s/ Chad W. Moeller _____
                                     Chad W. Moeller

NGEDOCS: 1492294.3